**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 19 CR 405-1 |
| ) | |
| BRIAN JOHNSON, ) | Judge Rebecca R. Pallmeyer |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Brian Johnson was convicted by a jury of seven counts of sex trafficking and three counts of possession or transportation of child pornography. He now moves for judgment of acquittal under Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial under Rule 33, arguing that the evidence was insufficient to sustain the verdict as to all counts and that this court erred in instructing the jury on the elements of his sex-trafficking counts. For the reasons stated below, the court denies Mr. Johnson's requests for a new trial and for judgment of acquittal on the sex-trafficking counts, but will acquit him on the child-pornography counts.

## BACKGROUND

Mr. Johnson was first indicted in May 2019 [1]. After he made a January 2023 escape attempt during a court-approved furlough, the Government charged him in a Second Superseding Indictment with seven counts of sex trafficking via fraud or coercion in violation of 18 U.S.C. 1591(a)(1) and (b)(1), four counts of possession or transportation of child pornography in violation of 18 U.S.C. § 2252(a)(1) and (a)(5)(B), and one count of escape in violation of 18 U.S.C. §§ 751(a) and 4082(a). (*See* Second Superseding Indictment [142] ("SSI").) In the lead-up to the April 2024 trial, Mr. Johnson pleaded guilty to the escape count and to one related count of possession of child pornography during the escape [188].

At trial, the Government's case-in-chief included testimony from seven of Mr. Johnson's victims and multiple law enforcement officials involved in his investigation and arrest, as well as

documentary evidence including Mr. Johnson's photos, videos, and online activities and forensic evidence of files stored on his personal computer and thumb drives.[1] The Government's evidence showed that Mr. Johnson had posed as the owner of a pornography and nude modeling company from at least 2010 to 2016.[2] (Tr. 213:1–214:14, 433:16–434:7.) He used various pseudonyms, including "Mike Mitchell," "David Burton," "Melissa Bono," and "Rachel Patel," and email accounts associated with these pseudonyms, to advertise opportunities for "artistic portraits" and tasteful nude modeling on the online forum Craigslist. (*Id.* 214:6–11, 466:18–488:6, 566:4–10, 837:5–838:3, 939:22–940:6.) When women contacted him about these postings, he enticed them with promises of benefits—such as lucrative salary offers, professional connections, and travel abroad—that they could expect to receive by working for his "company." (*Id.* 346:2–9, 862:3–863:5, 944:6–947:8.)

First, though, Mr. Johnson required that the women "audition" for a more permanent role by meeting him in person at various locations around the Chicago area. (*Id.* 41:15–42:6, 609:17–611:11, 737:20–739:25, 1013:13–1014:5.) During these "auditions," Johnson plied the women with alcohol, took explicit pictures and videos of them, and had sex with them. (*Id.* 66:19–69:13, 222:10–225:17, 664:24–669:18, 746:3–750:20, 792:15–796:18, 849:19–852:25, 998:21–1004:23.) He kept these images and videos in his possession, distributed them through DVDs and the Internet, and used them as samples to persuade other women to audition for him. (*Id.* 341:5–17, 528:8–529:1, 532:25–533:14, 1088:20–1089:10, 1314:7–1315:21.) While Mr. Johnson initially told the women that he would pay them for their auditions upon approval from his distributor, he later claimed that the photos and footage were unsatisfactory and that they would need to pose and have sex with him again in a "re-shoot" before getting paid. (*Id.* 135:22–139:1,

---

[1] Mr. Johnson elected not to testify or present any other affirmative evidence in his own defense.

[2] Citations to the trial record are as follows: pages 1–196 [207]; pages 197–447 [208]; pages 448–718 [209]; pages 719–917 [211]; pages 918–1190 [212]; pages 1191–1439 [213]; pages 1440–1598 [214].

265:7–267:8; 735:11–736:3, 756:10–15, 800:6–23, 855:8–856:5, 1035:7–25.) In communications with the women after these encounters, he would assert that they had initiated and enjoyed the sex, and he pressured them to engage in more extreme sexual acts. (*Id.* 83:17–85:7, 109:15–110:5, 681:6–21, 857:16–22, 1039:5–1040:16, 1057:23–1058:12.) Ultimately, none of the women who testified at trial ever received any payment. (*Id.* 153:11–13, 287:14–18, 696:14–18, 771:5–9, 825:12–16, 851:25–852:1, 1117:25–1118:23.) Most were over the age of 18, but one—Jami—was 16 when she auditioned for Mr. Johnson. (*Id.* 934:7–10, 1090:5–7.)

At the close of the Government's case, the defense moved for judgment of acquittal under Rule 29, and the court entered and continued the motion. (*Id.* 1437:22–1439:17.) The jury found Mr. Johnson guilty on all counts on April 17, 2024. (*Id.* 1593:23–1594:19.) Mr. Johnson has since renewed his Rule 29 motion on the same grounds raised at trial, while also moving in the alternative for a new trial under Rule 33. (*See* Mot. for Judgment of Acquittal or New Trial [217] ("Mot.")). The Government opposes both requests. (*See* Gov.'s Resp. to Def.'s Mot. for Acquittal or New Trial [221] ("Opp.").)

## DISCUSSION

### I. Sufficiency of the Evidence

Under Federal Rule of Criminal Procedure 29, the court must enter a judgment of acquittal of any offense for which, after viewing the evidence in the light most favorable to the government, no rational jury could have found the essential elements of the crime proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Gonzalez*, 737 F.3d 1163, 1168 (7th Cir. 2013). The jury's verdict is "entitled to great deference," and the court should not "reweigh the evidence or second-guess the jury's credibility determinations." *Id.* (citation omitted). Rather, the court's role is limited to "enforcing outer limits on reasonable inferences, guided by the relevant standard of proof." *United States v. Garcia*, 919 F.3d 489, 497 (7th Cir. 2019). The evidence presented by the Government must be insufficient on any available theory

of guilt in order to overturn the conviction. *United States v. Tate*, 97 F.4th 541, 546–47 (7th Cir. 2024).

Mr. Johnson claims that the evidence presented at trial was insufficient to support the jury's guilty verdicts on both the sex-trafficking and child-pornography counts. The court addresses each in turn.

### A. Sex-Trafficking Counts

The jury convicted Mr. Johnson on four counts of sex trafficking by means of fraud or coercion[3] under 18 U.S.C. § 1591(a) and three counts of sex trafficking by fraud alone.[4] Section 1591 provides for punishment of anyone

> (a) [w]ho[] knowingly—
>
> > (1) in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
> >
> > (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
> >
> > [while also] knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act . . . .

18 U.S.C. § 1591(a). "[C]ommercial sex act," in turn, is defined as "any sex act, on account of which anything of value is given to or received by any person." *Id.* § 1591(e)(3).

Mr. Johnson now contends that the Government's evidence was insufficient as a matter of law to meet the statutory elements of "sex trafficking" under Section 1591. He makes two main arguments: (1) that none of the women engaged in a "commercial sex act" as defined by the

---

[3] Specifically, Counts One, Three, Four, and Seven. (*See* SSI at 1, 3–4, 7.) While Count Four originally included a "force" allegation as well, the Government struck this allegation prior to trial. (*See* Redacted Indictment [197] at 4.)

[4] Specifically, Counts Two, Eight, and Nine. (*See* SSI at 2, 8–9.)

4

statute, and (2) that there was no evidence that he engaged in "coercion" for the counts where that element was as alleged as an alternative means of commission to "fraud."[5]

### 1. "Commercial Sex Act"

At trial, the Government presented three distinct theories to the jury for how Mr. Johnson had caused his victims to engage in "commercial sex acts": First, that Mr. Johnson's promises of careers, money, and fame were "things of value" that were "given to" his victims in exchange for "sex acts" that he participated in and filmed.[6] (Tr. 1494:20–1495:8.) Second, that Mr. Johnson "received" value from these sex acts in the form of explicit images and videos, which he kept in his possession, distributed via DVDs and the Internet, and used to entice other women to "audition" for him. (Id. 1495:9–1500:25.) And third, that Mr. Johnson "received" value in the form of sexual gratification from the intercourse itself. (Id. 1501:17–1502:19.)

Mr. Johnson argues that all three of these theories "impermissibly contort[]" the statutory text to fit facts that do not resemble "the typical pattern of sex trafficking." (Mot. at 3.) The definition of "commercial sex act" in Section 1591(e)(3), he contends, requires some form of quid pro quo exchange between two parties in which financial "value" is traded for sex. In his view, the Government's first theory fails to meet this requirement because none of the victims who "auditioned" for him ever actually *received* anything of value from him in return. The Government's

---

[5] In a single sentence, Mr. Johnson also contends that the evidence was insufficient to prove that he "knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained the subjects in the trafficking counts." (Mot. at 3.) He fails to provide any basis for this claim, and it is accordingly disregarded as waived. *United States v. Key*, No. 14 CR 562-4, 2016 WL 3693427, at *3 (N.D. Ill. July 12, 2016) (citing *United States v. Hasselbrock*, 663 F.3d 906, 914 (7th Cir. 2011)). And the evidence amply supports the allegation that he knowingly recruited his victims.

[6] The "sex acts" at issue include both Mr. Johnson's actual intercourse with the women and instances in which they engaged in masturbation or other sexual behavior on camera. The Government represented at trial that it would not take the position that the taking of a nude photo is itself a "sex act." (Tr. 1433:13–18). However, it did argue that a "sex act" is not limited to sexual intercourse and could include "acts of sexual gratification" such as "fondling, groping, or masturbation." (Id. 1493:20–24.) The court agreed with this interpretation and instructed the jury accordingly, and—for the reasons stated below—did not err in doing so.

second and third theories fail this test as well: as he argues, there was no evidence that the victims gave Mr. Johnson the images and videos in exchange for sex, and defining the "thing of value as the "sex act" itself would require a circular reading of the statute.

While the Seventh Circuit has not yet weighed in on the precise meaning of Section 1591(e)(3), other circuits have read the phrase "on account of which" to require some "causal connection between the sexual act and the giving or receiving of anything of value." *United States v. Raniere*, 55 F.4th 354, 365 (2d Cir. 2022). The prototypical fact pattern for sex-trafficking claims involves a three-way interaction between a pimp, a victim, and a client, in which the pimp forces, defrauds, or coerces the victim to engage in sex (or sexual behavior) with the client in exchange for money (or other value). *See, e.g.*, *United States v. Cephus*, 684 F.3d 703, 705–06 (7th Cir. 2012) (defendant forced women into prostitution ring and collected fees from clients); *cf. Richardson v. Nw. Univ.*, No. 21 C 522, 2023 WL 6197447, at *7 (N.D. Ill. Sept. 21, 2023) (defendants received "value" in the form of donations and financial support in return for allowing fans and donors to sexually touch and grope cheerleaders). The statutory term "commercial sex act," connoting a transactional exchange of value for sex, appears to have been drafted with this context in mind.

This case, in contrast, involves a *two*-way interaction between a sham porn producer and the women who engaged in his fraudulent "auditions." The court acknowledges that the Government's second two theories—in which Mr. Johnson "received" value in the form of explicit images and sexual gratification—require stretching the statute's language further to fit this context. Arguably, the literal meaning of Section 1591(e)(3)—"any sex act, *on account of which* anything of value is *given to or received by* any person"—is capacious enough to include causal relationships in both directions: both sex given in return for value, and value derived as a result of sex. 18 U.S.C. § 1591(e)(3) (emphasis added). (*See also* Tr. 1501:1–7 (Government's argument to the jury: "[Thing of value] means given or received -- . . . either of those things. The victim can give it, the defendant could give it, or the victim can receive it, or the defendant can

6

receive it by any person.") But this is arguably at odds with the term "commercial," which seems to imply an exchange between *two* parties; under the Government's reading, all benefit could potentially inure to Mr. Johnson's side alone. And the third theory poses an additional surplusage problem: as Mr. Johnson points out, defining "value" as sexual gratification risks collapsing the two statutory terms "thing of value" and "sex act" into one another. *See United States v. Turner*, 47 F.4th 509, 517–18 (7th Cir. 2022) (noting that courts generally "read statutory text with an eye toward avoiding rendering any language superfluous," though "not [as] an absolute rule") (citation omitted); *Doe v. Fitzgerald*, No. CV 20-10713-MWF (RAOx), 2022 WL 425016, at *6–7 (C.D. Cal. Jan 6, 2022) (declining to consider "'sexual gratification' alone" as a "thing of value" since "adopting a scope this broad could yield absurd results").[7] *But see United States v. Cook*, 782 F.3d 983, 988 (8th Cir. 2015) (finding that "sexual acts" that defendant received could constitute "things of value").

The court need not definitively rule on these interpretive issues, though. The law and the facts of this case overwhelmingly support the Government's first theory—that Mr. Johnson's victims traded sex for "value" in the form of promises of money and career opportunities. The Seventh Circuit has implicitly recognized that a "thing of value" need not actually be *received* to satisfy the "commercial sex act" element in holding that the statute does not require such an act to have actually been completed. *United States v. Wearing*, 865 F.3d 553, 555–56 (7th Cir. 2017). The *Wearing* court read Section 1591(a)'s use of the future tense in the phrase "*will be caused* to engage in a commercial sex act" to suggest that the relevant question is not whether the victim has actually engaged in a sex act, but whether the defendant has acted with the *intent* to make them do so. *Id.* (emphasis added). It follows, then, that if the defendant also intends the

---

[7] Indeed, reading the statute this broadly risks criminalizing a host of sexual behavior beyond the common understanding of "sex trafficking." Under this reading, a user of an online dating app who "fraudulently" catfishes another user into a sexual encounter under a false name, and in doing so derives "value" in the form of sexual gratification has potentially violated the statute and faces a potential life sentence—an extreme penalty for this conduct, however unsavory it is. *See* 18 U.S.C. § 1591(b)(1); *Fitzgerald*, 2022 WL 425016, at *6–7.

envisioned sex act to be "commercial" at the time of recruitment, that is enough to support conviction under the logic of *Wearing*. Other circuits have held that a "'[]thing of value' need not have a monetary or financial component" and may include "intangibles" like "the promise of sexual intercourse" or "a promise to reinstate an employee." *Raniere*, 55 F.4th at 361–62 (citation omitted); *see Cook*, 782 F.3d at 989 (noting that "[t]he phrase 'anything of value' is extremely broad"). In *Noble v. Weinstein*, the Southern District of New York rejected the film producer Harvey Weinstein's attempt to make essentially the same defense that Mr. Johnson makes here— that the "sex acts" he induced the plaintiff to perform during an "audition" were not "commercial" since he never ultimately gave her anything in return. 335 F. Supp. 3d 504, 521 (S.D.N.Y. 2018). The district court held that the statute's "expansive language" required a "liberal reading" that encompassed not only *actual* value (whether financial or intangible) but the "prospect" and "reasonable expectation" of future value. *Id.* ("The contention . . . that [plaintiff] was given nothing of value—that the expectation of a film role, of a modeling meeting, of "his people" being "in touch with her" had no value—does not reflect modern reality.").

The facts here are arguably even more "commercial" than those of the *Weinstein* case. The women who contacted Mr. Johnson on Craigslist did not agree to "audition" for him on a whim or for their own enjoyment. (*See, e.g.*, Tr. 768:17–23 ("Q. If the defendant had told you he just wanted to . . . have sexual intercourse and take some pictures and video of you for fun, would you have met with him? A. No. Q. What was your motivation in meeting with him? A. Financial and like a career."), 1104:21–1105:4.) Many were desperate for money, and some were on the verge of homelessness. (*Id*. 82:6–18, 255:12–25, 581:10–15, 760:7–15.) The jury could reasonably have concluded that they would not have performed sex acts with him, and on camera for him, had he not dangled promises of financial security and professional advancement before their eyes. That they never received these benefits in the end—thanks to Mr. Johnson's own fraud—does not change the fundamentally "commercial" nature of their actions. If the statute's

8

basic purpose is to criminalize forcing, defrauding, or coercing people into transactional sex, it makes absolutely no difference that in this case, Mr. Johnson never completed the transaction.

Mr. Johnson's only remaining defense on this front is factual, not legal. He argues that, under these circumstances, it was not reasonable for his victims to believe that he would actually follow through on his extravagant promises about international modeling opportunities and lucrative contracts. He attempts to distinguish *Weinstein* and like cases by arguing that they involved more famous defendants like the "world-famous" Harvey Weinstein, in contrast to his Craigslist adult video operation. (Mot. at 4.) But the statute contains no such limitation that an expectation of value in return for sex must be objectively "reasonable." *See Cook*, 782 F.3d at 988 (noting that "[v]alue is a subjective, rather than objective, concept where the focus of the term is to be placed on the value . . . subjectively attache[d] to what is sought to be received") (cleaned up). And to the extent that Mr. Johnson is implying that the witnesses' testimony misrepresented or exaggerated the trust that they placed in him, this goes to their credibility—a question beyond this court's purview under Rule 29. *United States v. Farmer*, 717 F.3d 559, 562 (7th Cir. 2013). Simply put, it is not Mr. Johnson's right to second-guess whether his victims were "reasonable" in believing his lies.

### 2. Coercion

Next, Johnson argues that the evidence was insufficient to establish that he engaged in "coercion" for purposes of Counts One, Three, Four, and Seven. "Coercion" is defined as

(A) threats of serious harm to or physical restraint against any person;

(B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

(C) the abuse or threatened abuse of law or the legal process.

18 U.S.C. § 1591(e)(2). The Government argued at trial that Mr. Johnson had "coerced" the four women in question—Jami, Heather, Yana, and Rebecca—in a number of ways: by exploiting their desperate need for money to pressure them to "audition" for him; by having them sign contracts

with his fake production "company" that he later threatened to enforce against them in court; and by threatening to distribute their images and videos on the Internet if they did not continue to meet with him for sex.

Mr. Johnson contends that none of the Government's evidence is sufficient to establish "coercion" as defined under Section 1591(e)(2). He argues that none of the four women were ever physically threatened or restrained, that the Government never introduced any evidence proving that the contracts they signed were legitimate or legally binding, and that there was insufficient evidence that any of the victims reasonably believed they would suffer "serious harm" if they did not comply with his wishes. As to Jami specifically, he argues that he cannot have retroactively "coerced" her to engage in sex acts, since any threats he made postdated her physical encounters with him. As to Yana, he challenges the accuracy of her recollection of events that took place fourteen years ago, calling attention to purported inconsistencies in her testimony.

Mr. Johnson's arguments fail for several reasons. Most importantly, the four counts in question charged him with coercion only in the alternative to fraud. The Government's evidence overwhelmingly showed that Mr. Johnson had followed the same modus operandi for all seven witnesses, using multiple false identities and email accounts to trick them into believing that they were "auditioning" for a role with a legitimate modeling company. (Tr. 373:14–383:21, 384:15–387:17, 493:9–19, 497:24–501:24.) So even if the Government failed to prove that Mr. Johnson had "coerced" Jami, Heather, Yana, or Rebecca into engaging in commercial sex acts, the evidence would still be more than sufficient to support the conclusion that he had "defrauded" them into doing so.[8]

---

[8] Mr. Johnson does not even contest fraud as a general matter; rather, he only raises that defense as to two specific victims, Grace and Kaylie. He argues that since both only assented to nude modeling (which cannot, by the Government's admission, constitute a "sex act" without more explicit conduct), and the evidence introduced at trial did not depict them engaging in any "sex acts," there was no fraud since any sex with Mr. Johnson was "outside the scope of" their

10

Beyond this, the evidence also amply supported a jury finding of "coercion" as to Jami, Heather, Yana, and Rebecca, all of whom testified that they continued to meet Mr. Johnson for follow-up sexual encounters based largely on the fear and stress they felt from his manipulation. Section 1591(e)(2)(B) defines the second enumerated means of coercion as "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm." 18 U.S.C. § 1591(e)(2)(B). This definition "requires jurors to look not at each threatening act in isolation, but instead at the entire course of the defendant's threatening conduct." *United States v. Delaney*, No. 18-1919, 2022 WL 356731, at *3 (7th Cir. Feb. 7, 2022), *reh'g denied,* No. 18-1919, 2022 WL 1652309 (7th Cir. May 24, 2022). "[S]erious harm" is defined as "any harm . . . including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. § 1591(e)(5).

Jami testified that she felt "[p]ressured into [meeting with Mr. Johnson] further and not completely willing" after receiving emails from the defendant that criticized her performance and body image and scrutinized her past sexual history. (Tr. 1032:11–20, 1035:16–1036:9.) Heather testified that she was in dire financial straits supporting her mother and son, that Mr. Johnson offered her not only modeling work but an opportunity for cheap rental housing in downtown Chicago, and that he issued her a "cutoff time" to meet with him for a follow-up filming session or else "everything . . . [was] off the table." (*Id.* 829:19–830:1, 871:21–872:2, 873:23–874:13.) Yana testified that she was similarly desperate for money, that the defendant repeatedly withdrew offers

---

bargain with him. (Mot. at 9, 12.) But this argument fails. The jury was instructed that "[a] statement or representation is fraudulent if it is made or caused to be made with *intent to deceive*," and that "[t]he law prohibits you from considering whether, had [the victims] been more diligent, they might have discovered or prevented any fraud." (Tr. 1474:16–22 (emphasis added).) Grace and Kaylie's understanding of the original scope of their bargain with Mr. Johnson is irrelevant to whether he ultimately defrauded them into having sex with him based on their expectation of future payment. The relevant question, rather, is "the defendant's plan for [them] at the time he recruit[ed] them." *Wearing*, 865 F.3d at 556.

of payment because of her allegedly inadequate performance, and that he threatened to distribute her images online if she challenged him—a threat that he ultimately carried out against her wishes after she broke off contact.[9] (*Id.* 94:1–3, 122:11–17, 126:4–6, 503:9–506:23). Rebecca testified that she continued to meet with Mr. Johnson after he threatened to distribute her photos to her potential employers, family, and friends. (*Id.* 263:15–19.) It was the jury's prerogative to accept that all four women "reasonably" feared serious harm—whether psychological, financial, or reputational—from Mr. Johnson's manipulative campaign.

## B. Child-Pornography Counts

In addition to the sex-trafficking counts, the jury also convicted Mr. Johnson on two counts of transportation of child pornography in violation of 18 U.S.C. § 2252A(a)(1)[10] and one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).[11] All of these counts stemmed from Mr. Johnson's interactions with one particular witness, Jami.

Jami testified that she met Mr. Johnson over Craigslist in the fall of 2012, when she was 16 years old and looking to make additional money while living away from home in Chicago. (Tr. 934:14–938:4.) Mr. Johnson used the false persona "Rachel Patel" to communicate with her, and she, in turn, used a pseudonym of her own, telling him that she was a 23-year-old nursing student named "Mari." (*Id.* 936:1–940:18, 1110:6–1112:6.) Jami's statements that she was 23 were consistent with her own fake ID showing that age, though there is no evidence that she showed

---

[9] Defendant's challenge to Yana's credibility based on her allegedly faulty recollection of events is, again, beyond this court's purview on a Rule 29 motion. *See Farmer*, 717 F.3d at 563 ("To find a witness' testimony incredible as a matter of law, it must have been physically impossible for the witness to observe what [s]he described, or impossible under the laws of nature for those events to have occurred at all.") (cleaned up).

[10] Specifically, Counts Five and Ten. (SSI at 5, 10.) *See* 18 U.S.C. § 2252A(a)(1) (making it a crime to "knowingly mail[], or transport[] or ship[] using any means or facility of interstate or foreign commerce . . . including by computer, any child pornography").

[11] Specifically, Count Six. (SSI at 6.) *See* 18 U.S.C. § 2252A(a)(5)(B) (making it a crime to "knowingly possess[] . . . or access[] with intent to view . . . [any] material that contains an image of child pornography that has been mailed, or shipped or transported using any means of facility of interstate or foreign commerce . . . including by computer").

the ID to Mr. Johnson. (*Id.* 938:12–14, 982:25:983:7.) Jami met with Mr. Johnson roughly four times, posing nude for images and photos and engaging in sex acts with him. (*Id.* 998:21–1004:23, 1121:15–18.) She eventually broke off contact with him in December 2012 after he pressured her to engage in more extreme conduct and threatened to sue her for not complying with his demands. (*Id.* 1082:13–17.) Later that month, however, Jami began receiving calls stating that her nude images were showing up on online porn sites. (*Id*. 1088:6–1089:10.) She confronted Mr. Johnson via email and demanded that he have the images taken down, revealing for the first time that she had been 16 at the time they were taken. (*Id.* 1089:20–1090:16.) When she threatened to report him to the police, Mr. Johnson angrily denied her claims of being underage, but still told her (untruthfully) that he would delete all of her images and footage. (*Id.* 1090:17–1103:15.)

The Government presented forensic evidence that Mr. Johnson continued to transmit Jami's images online at least twice after this interaction: once via an email exchange with another user on Craigslist in August 2013, and again via a post on the blog site Tumblr in March 2015. (*Id*. 1195:21–1203:24, 1309:7–1313:13.) When the FBI raided Mr. Johnson's house in March 2016, Jami's images were found on multiple devices in his possession, including a hard drive and several thumb drives. (*Id.* 295:13–14, 363:1–369:21, 408:20–410:4, 436:10–19.)

Mr. Johnson contends that, on these facts, he cannot be convicted of either transportation or possession of child pornography. Section 2252A requires the Government to prove that the defendant knew the person depicted in the pornographic materials was under the age of 18 as an essential element of the charged offense.[12] *United States v. Rogers*, 474 F. App'x 463, 476–77 (7th Cir. 2012) (citing *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994)); *United States v. Peel*, 595 F.3d 763, 771 (7th Cir. 2010). As Mr. Johnson argues, he reasonably believed Jami

---

[12] The relevant age cutoff for Section 2252A's definition of "child pornography" is 18 years. *See* 18 U.S.C. §§ 2252A, 2256(1), (8).

13

was over 18 years old when he first met her in 2012, and his disbelief when she later told him otherwise was equally reasonable under the circumstances.

While the burden to overturn a jury's guilty verdict under Rule 29 is high, the Seventh Circuit has held that "the height of the hurdle depends directly on the strength of the government's evidence." *Garcia*, 919 F.3d at 496–97 (quoting *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013)). A motion under Rule 29 is akin to a motion for summary judgment or for judgment as a matter of law in a civil case, and "the judge is still responsible for enforcing outer limits on reasonable inferences, guided by the relevant standard of proof." *Id.* The standard "does not require the defendant to demonstrate that no evidence at all supports the conviction, but rather that the evidence cannot support a finding of guilt beyond a reasonable doubt." *United States v. Rahman*, 34 F.3d 1331, 1337 (7th Cir. 1994).

The court cannot agree with the jury's finding that this standard was met for the scienter element of Mr. Johnson's child-pornography charges. It is uncontested that when Jami first contacted Mr. Johnson in 2012, she represented—multiple times—that she was 23 years old, the age listed in her fake ID. (Tr. 939:12–13, 1108:20–1111:4.) More generally, the evidence consistently showed that Mr. Johnson targeted and sought out adult, not underage, performers for his video and photo shoots. (*Id.* 549:19–550:7, 1110:1–2, 1112:9–1113:12.) For example, he repeatedly expressed a preference for bodies with abundant pubic and axillary hair. (*Id.* 112:11–13, 379:14–23, 948:3–5.) *See United States v. Dewitt*, 943 F.3d 1092, 1096 (7th Cir. 2019) (noting that "contextual factors in determining age . . . [may] include a defendant's own stated sexual preferences"). The Government presented no expert testimony as to Jami's apparent age in the photos, which—while not per se necessary—may be "all but require[d]" in cases where, as here, the subject's age is less than "obvious from appearance." *Id.*; *see United States v. Stout*, 509 F.3d 796, 800 (6th Cir. 2007) (noting that "[a]ctual knowledge in a child pornography case is often, undoubtedly, difficult to show when the persons depicted are teenagers"). When Jami later confronted Mr. Johnson, he clearly stated that he did not believe her and demanded proof that

14

she was underage.[13] (Tr. 1319:13–25 ("You were not 16. That's bull[****].").) Given the circumstances—in which Jami was attempting to persuade him to take her images off the Internet by any means necessary—it is hardly surprising that Mr. Johnson would have failed to take her at her word.

The definition of "knowingly" in the court's instructions to the jury was taken directly from the Seventh Circuit's Pattern Jury Instruction 4.10: "A person acts knowingly if he realizes what he's doing and is aware of the nature of his conduct and does not act through ignorance, mistake, or accident." (Tr. 1472:22–1473:2.) The Government was required to prove more than that Mr. Johnson *should have* known Jami's age after her December 2012 email; mere negligence, or even "reckless disregard" as allowed for an underage sex-trafficking charge under Section 1591(a), was insufficient. *See Rogers*, 474 F. App'x at 477; *cf. United States v. Ciesiolka*, 61 F.3d 347, 353 (7th Cir. 2010) (discussing scienter requirements under 18 U.S.C. § 2422(b) for defendant's knowledge of "victim's" age in online sex-predator sting operation). Its attempts to establish Mr. Johnson's actual knowledge rested on "entirely circumstantial" evidence, *Jones*, 713 F.3d at 340: namely, his emailed false promises to Jami that he would delete her images, and a later email from 2015 where he sent her a link to her images on a site that advertised its specialty as "[e]thnic, exotic, and hairy . . . teen girls." (Tr. *Id.* 1092:21–1103:15, 1322:8–1326:2.) While Mr. Johnson's knowledge could in theory be inferred from these messages, they simply do not "permit[] an inference [of guilt] beyond a reasonable doubt" without "laps[ing] into speculation." *Garcia*, 919 F.3d at 503.

Without a stronger showing on this front, the Government failed to meet its burden of proving beyond a reasonable doubt that Mr. Johnson knew Jami was a minor in the images that

---

[13] While Jami later sent a redacted picture of her real ID to one of Mr. Johnson's many email accounts, Mr. Johnson could have believed that this ID was fake in light of her conduct and representations up to this point. (Tr. 1100:15–1101:10.) At the least, this evidence does not establish his actual knowledge beyond a reasonable doubt.

he transported and possessed. Where "no rational trier of fact could [thus] find guilt beyond a reasonable doubt" on Mr. Johnson's child-pornography charges, his motion for judgment of acquittal on these charges must be granted.[14] *Garcia*, 919 F.3d at 497 (quoting *Jackson*, 443U.S. at 317).

## II. Motion for a New Trial

Plaintiff's motion in the alternative for a new trial under Rule 33 may be granted "if the interest of justice so requires." FED. R. CRIM. P. 33(a). A new trial is appropriate if, among other things, the jury's verdict is "against the manifest weight of the evidence" or if a legal error occurred during the trial that was "of sufficient magnitude to require reversal on appeal." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (citing *United States v. Kuzniar,* 881 F.2d 466, 470 (7th Cir. 1989)). The decision of whether to grant a new trial is within the district court's discretion and is generally "reserved for only the most extreme cases." *United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021) (citation omitted).

Mr. Johnson's stated grounds for a new trial largely track his sufficiency challenges to the sex-trafficking charges. He claims that the court erred in: (1) instructing the jury that "[i]t is not required that the victim actually perform a commercial sex act" to satisfy that element of the statute (Tr. 1473:4–6); (2) omitting his requested instruction that "[n]ude photographs by themselves are not sex acts" (*id.* 1434:5–10); and (3) instructing the jury that "[a] 'thing of value' need not involve

---

[14] The court's decision on this front should does not cast doubt on the propriety of Mr. Johnson's decision to plead guilty to Count Twelve of the Government's Second Superseding Indictment. The Government charged Mr. Johnson with an additional count of possession of child pornography following his January 2023 escape attempt, when he was apprehended with thumb drives containing some of Jami's images. (Tr. 1257:25–1259:4; Pretrial Conf. Tr. [206] 4:12–5:5.) Whether Mr. Johnson knew Jami's age in these pictures at this point—more than three years after his initial indictment on child-pornography charges—is a completely different question from whether he knew in 2013 or 2015, well before the charges would have put him on notice of Jami's age.

16

a monetary exchange and need not have any financial component" (*id.* 1473:25–1474:1).[15] He further argues that the prosecution's closing statement improperly misled the jury to believe, based on these instructions, that they could find the "commercial sex act" element satisfied based solely on his own receipt of "value" from images, videos, and sexual gratification. Mr. Johnson also argues that the weight of the evidence did not support submitting the means of "coercion" to the jury. And finally, he contends that the cumulative effect of these and other errors at trial require granting his Rule 33 motion.

The court's instructions to the jury must accurately define all essential elements of the charged offense to comport with due process. *United States v. Edwards*, 869 F.3d 490, 499 (7th Cir. 2017). Nevertheless, district courts have "substantial discretion" in formulating their instructions as long as they completely and correctly summarize the law. *United States v. Siepman*, 107 F.4th 762, 765 (7th Cir. 2024). To obtain a new trial based on an alleged jury-instruction error, a defendant must show that (1) the court's instruction was an incorrect or inaccurate statement of the law and that (2) he was prejudiced by this error. *Id.* Even "an inaccurate jury instruction constitutes harmless error" where the evidence is sufficiently "one-sided or overwhelming" that "there is no reasonable probability that but for the error the outcome of the trial would have been different." *United States v. Carson*, 870 F.3d 584, 602–03 (7th Cir. 2017). Similarly, a prosecutor's misstatement of the law during a closing argument is harmless if there is no possibility that it affected the jury's verdict. *See United States v. Medina Casteneda*, 511 F.3d 1246, 1249–50 (9th Cir. 2008).

Mr. Johnson's arguments for a new trial fail under these principles. His objection to the court's instruction that "[i]t is not required that the victim actually perform a commercial sex act"

---

[15] Mr. Johnson timely raised all of these objections as required by Rule 30(d). (*See* Tr. 1375:18–23, 1384:4–10, 1389:23–1390:12, 1391:13–1393:10, 1409:2–8, 1433:6–23.) Mr. Johnson also incorporates all of his other pretrial and trial motions and objections by reference in his Rule 33 motion, but he does not offer any further basis to dispute the court's initial rulings on these motions and objections aside from those raised above.

runs directly counter to the Seventh Circuit's holding in *Wearing*, 865 F.3d at 556. His requested clarification that "[n]ude photographs by themselves are not sex acts," meanwhile, was unnecessary even if legally accurate. The Government disclaimed any position that the mere taking of nude photos could, without more, constitute "sex acts," and clarified as much to the jury in its closing argument and accompanying exhibits. (Tr. 1387:5–11, 1433:13–18, 1493:20–25.) *See United States v. Johnson*, 750 F. App'x 475, 478 (7th Cir. 2018) (noting that "[a] defendant is entitled to an instruction on his theory of defense" only if, among other things, "the failure to give the instruction would deprive [him] of a fair trial").

Mr. Johnson's challenges to the court's instruction on the definition of a "thing of value," as well as to the Government's arguments in closing that the "commercial sex act" element could be satisfied by evidence of his own unilateral receipt of value, present a slightly closer question. It is true, as noted, that the Seventh Circuit has not defined the statutory terms "commercial sex act" or "thing of value" with particularity. But the plain text of the statute, as well as decisions from other circuits, strongly support the Government's position that a "'[]thing of value' need not have a monetary or financial component." *Raniere*, 55 F.4th at 361–62; *Cook*, 782 F.3d at 988–89. And the Eighth Circuit has further held that a defendant's own receipt of "sexual acts, photographs, and videos" can constitute "things of value" for purposes of Section 1591(e)(3). *Cook*, 782 F.3d at 989–90. At minimum, then, this court's instructions and the Government's argument did not clearly misstate the applicable law on this issue.

Even if Mr. Johnson's contrary interpretation is correct, and the statute requires a reciprocal exchange of financial value between two parties—a question that, again, the court takes no position on here—any error in allowing the Government to present its alternative theories to the jury would be harmless. *See Delaney*, 2022 WL 356731, at *4. As the court found in ruling on Mr. Johnson's Rule 29 motion, the evidence overwhelmingly showed that Mr. Johnson's victims were "coerced" or "defrauded" into performing sex acts for him based on his promises of "value" in the form of money and financial security—a theory of guilt amply supported by the

caselaw. *See Weinstein*, 335 F. Supp. 3d at 521; *Raniere*, 55 F.4th at 361. There is no world in which the jury could have reviewed this evidence and not found these sex acts to be "commercial" within the meaning of the statute. Thus, Mr. Johnson has failed to prove that he suffered sufficient prejudice to warrant a new trial. *Carson*, 870 F.3d at 602–03.

Mr. Johnson's weight-of-the-evidence challenge to the "coercion" instruction fails for the same reasons already stated concerning the sufficiency of this evidence under Rule 29. *See supra* Section I.A.2. His brief and perfunctory claim of cumulative error is disregarded as waived. *See United States v. Key*, No. 14 CR 562-4, 2016 WL 3693427, at *3 (N.D. Ill. July 12, 2016) (citing *United States v. Hasselbrock*, 663 F.3d 906, 914 (7th Cir. 2011)). His Rule 33 motion for a new trial is therefore denied.

## CONCLUSION

Defendant's motion for judgment of acquittal [217] is granted as to Counts Five, Six, and Ten of the Government's Second Superseding Indictment, and denied as to all other counts. His motion in the alternative for a new trial is denied.

ENTER:

Dated: September 24, 2024

_____
REBECCA R. PALLMEYER
United States District Judge